UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SANDRA M. DARNELL,                    )
                                      )
              Plaintiff,              )
                                      )
       v.                             )     No.  4:05CV2211 ERW
                                      )                      (FRB)
                                      )
JO ANNE B. BARNHART,                  )
Commissioner of Social Security,      )
                                      )
              Defendant.              )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

        This cause is before the Court on Plaintiff's appeal of
an adverse ruling of the Social Security Administration.  All
pretrial matters were referred to the undersigned United States
Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate
disposition.

### I.  Procedural History

        On November 7, 2003, plaintiff Sandra M. Darnell filed an
application for Disability Insurance Benefits pursuant to Title II,
42 U.S.C. §§ 401, et seq., in which she alleged that she became
disabled on October 1, 2003.  (Tr. 40-42.)  On initial considera-
tion, the Social Security Administration denied Plaintiff's claim
for benefits.  (Tr. 23, 25-29.)  On May 24, 2005, a hearing was
held before an Administrative Law Judge (ALJ).  (Tr. 165-91.)
Plaintiff testified and was represented by counsel.  On June 16,
2005, the ALJ issued a decision denying Plaintiff's claim for

benefits. (Tr. 11-21.) On September 23, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 5-7.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

At the hearing on May 24, 2005, Plaintiff testified in response to questions posed by the ALJ and counsel. Plaintiff is forty years of age. Plaintiff stands five-feet, five-inches tall and weighs 208 pounds. Plaintiff lives in a ranch home with her husband as well as her two children, ages thirteen and eleven. (Tr. 169-70.) Plaintiff completed high school and attended two years of college. (Tr. 170.)

From 1984 through 1994, Plaintiff worked as an assistant branch manager at McDonnell Douglas Credit Union. From 1994 through 1997, Plaintiff worked as an administrative assistant at UCI Medical Center in California. From 1999 through October 2003, Plaintiff worked as a substitute teacher. (Tr. 170-71.)

Plaintiff testified that she has been diagnosed with fibromyalgia and has been under a doctor's care for such condition since 2003. (Tr. 173.) Plaintiff testified that she was first treated by her primary care physician, was then referred to a rheumatologist, and continues to see a rheumatologist to date. (Tr. 174.)

Plaintiff testified that her condition causes her to

- 2 -

experience severe pain in her hands, arms and shoulders and causes her difficulty with the use her arms. Plaintiff testified that she has also developed symptoms in her legs. (Tr. 175.) Plaintiff testified that her symptoms have gotten considerably worse over time and that, currently, she has specific difficulty using her hands and arms, and experiences a lot of pain in her legs. Plaintiff testified that the pain is a deep, burning pain and that her muscles fatigue easily. (Tr. 176.) Plaintiff testified that she experiences pain constantly and that her pain is generally at a level four on a scale of one to ten when she takes her prescription medication. (Tr. 177-78, 189.) Plaintiff testified that her pain increases to a level seven when the medication begins to wear off. (Tr. 178.) Plaintiff testified that she has no other adverse health conditions. (Tr. 181.) Plaintiff testified that she experiences more bad days than good days with her condition, and that she does not participate in any activities on bad days because the pain prevents her from doing so. (Tr. 189.)

Plaintiff testified that she takes pain medication, Oxycontin, which causes side effects such as dizziness, drowsiness, forgetfulness, and confusion. Plaintiff testified that she informed her doctor of these side effects and was advised that they were common. (Tr. 178.) Plaintiff testified that she nevertheless continues with the medication because she "ha[s] to." Plaintiff testified that the medication provides some relief in that it makes

the pain bearable.  (Tr. 179.)  Plaintiff testified that she also takes the generic form of Prozac to help alleviate pain and fatigue symptoms.  (Tr. 181.)

Plaintiff testified that her condition causes her to have problems with lifting, holding, writing, or any activity which requires her arms to be outstretched.  Plaintiff testified that she constantly drops things because of a poor grip, and that she occasionally has difficulty with buttons because of the pain. Plaintiff testified that she is able to lift small things, such as a book, but that she is unable to hold a book out in front of her and must rest it on a table or on her lap.  (Tr. 180.)  Plaintiff testified that she also avoids activities which involve walking distances because of the pain in her legs.  (Tr. 181.)

With respect to her daily activities, Plaintiff testified that her family takes care of household duties such as vacuuming, sweeping and mopping.  Plaintiff testified that her participation in such activities gradually decreased to the point that her family now performs such chores exclusively and has done so for approximately one and one-half years.  (Tr. 182.)  With respect to other duties, such as dishwashing, laundry, wiping counters and cabinets, and picking up newspapers, Plaintiff testified that her family performs most of those chores, except that she will wipe down the counter if she sees a spill.  (Tr. 182-83.)  Plaintiff testified that her children do the dishes.  Plaintiff testified

that her husband or son accompany her to the grocery store to lift the heavier items. Plaintiff testified that she is able to lift small cans and meat, but that she does not lift any bulky items. (Tr. 183.) Plaintiff testified that her trips to the store are short – not longer than half an hour, and that she goes once every week or two. (Tr. 183, 187.) Plaintiff testified that her husband carries the groceries into the home and that her husband and children put the groceries away. (Tr. 183.) Plaintiff testified that she prepares meals for her family using primarily the microwave or preparing one-dish meals. (Tr. 183-84.) Plaintiff testified that she usually does not make anything from scratch. Plaintiff testified that she does no yard work. Plaintiff testified that she has a driver's license and drives only short distances, such as five or six miles, from her home. Plaintiff testified that she cannot drive longer distances because of the discomfort in holding the steering wheel and because of the effects of her medication. (Tr. 184.) Plaintiff testified that she checks electronic mail on her computer every day or two and that she is on the computer for five or ten minutes at a time. Plaintiff testified that the pain in her hands prevents her from typing on the keyboard, but that her daughter will type for her. Plaintiff testified that she occasionally sees friends, but not often. Plaintiff testified that she attends church but that she misses many Sunday services because she does not feel well. Plaintiff

testified that she no longer teaches Sunday school as she used to. (Tr. 185.)

Plaintiff testified that on a typical day, she gets her children ready for school but that her husband takes them to school. (Tr. 185.) Plaintiff testified that she then tries to do a load of laundry. Plaintiff testified that after a few hours, she lies down to take a nap because she is so fatigued. Plaintiff testified that she naps three or four days a week and sometimes for several hours. Plaintiff testified that her legs become very painful and stiff if she is in one position for too long and that she frequently alternates during the day between sitting, standing and walking. Plaintiff testified that, on a good day, she can sit for up to forty-five minutes. Plaintiff testified that on other days, she fidgets when she sits and must get up every ten to fifteen minutes. (Tr. 186.) Plaintiff testified that she can walk only short distances and cannot walk even one block if there is any incline to the walking surface. (Tr. 187.) Plaintiff testified that she cannot stand longer than ten to fifteen minutes in one position. Plaintiff testified that she is able to lift light items such as dishes, pots or pans, but that she is unable to carry such weight from room to room. (Tr. 188.)

### III.  Medical Records

Plaintiff visited Dr. Robert R. Kunkel on January 9, 2003, and complained of stiffness, aching and weakness in her

hands. Plaintiff reported that she had been experiencing such symptoms for a couple of weeks and that they had worsened. It was noted that Plaintiff was taking Tylenol. (Tr. 106.) Physical examination showed no swelling and good range of motion. Dr. Kunkel determined for Plaintiff to undergo laboratory testing and x-rays to rule out rheumatoid arthritis. (Tr. 105.) X-rays taken that same date of Plaintiff's hands were negative. Specifically, the x-rays showed no fracture, dislocation, abnormal bone production, or destruction. No bony erosions were seen and the soft tissues were noted to be normal. (Tr. 116.) Likewise, blood test results from that same date were within normal limits, including laboratory testing for rheumatoid arthritis factor. (Tr. 115.) Upon review of the test results, Dr. Kunkel prescribed Vioxx[1] for Plaintiff. (Tr. 105.)

On January 20, 2003, Plaintiff telephoned Dr. Kunkel's office and complained that the pain had worsened and that she currently experienced pain up to her elbows and shoulders. (Tr. 105.) During an office visit on January 27, Plaintiff continued to complain of pain in her hands, elbows and shoulders. Plaintiff reported that the pain was worsening and that Vioxx provided no relief. Dr. Kunkel noted Plaintiff's hands to be tender to touch. Dr. Kunkel questioned whether Plaintiff had osteoarthritis and

_____

[1]Vioxx is indicated for the relief of signs and symptoms of osteoarthritis and for the management of acute pain. Physicians' Desk Reference 2049-50 (55th ed. 2001).

Bextra[2] was prescribed.  (Tr. 104.)

On February 18, 2003, Plaintiff followed up with Dr. Kunkel who instructed that she continue with Bextra.  (Tr. 103.)

Plaintiff returned to Dr. Kunkel on June 5, 2003, who noted Plaintiff to have possible rheumatoid arthritis.  Plaintiff was noted to have stiffness in her hands.  Plaintiff also complained of hair loss and tightness in her chest.  It was noted that Plaintiff had taken diet pills and was under a lot of stress.  (Tr. 102.)  The results of laboratory testing conducted that same date were generally within normal limits.  Plaintiff's white blood count and platelet count were slightly elevated, and Plaintiff's carbon dioxide level was slightly low.  (Tr. 111-14.)

On June 10, 2003, Plaintiff underwent an echocardiogram.  (Tr. 109-10.)  Plaintiff was noted to be "status post anorexic agents."  The results of the diagnostic testing showed no evidence of pulmonary hypertension and no regurgitation in the pulmonic valve.  The valves appeared to be competent.  Mild left ventricular hypertrophy was noted.  Otherwise, the test revealed normal results.  (Tr. 109.)

On June 14, 2003, Plaintiff had x-rays taken of her left wrist and hand in response to complaints of continued pain.  The x-

---

[2]Bextra is a non-steroidal anti-inflammatory drug (NSAID) used to relieve some symptoms caused by arthritis, such as inflammation, swelling, stiffness, and joint pain.  Medline Plus (revised Apr. 8, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602011.html>.

rays were negative, showing no fractures, dislocations, bone production, or destruction. (Tr. 107-08.)

Plaintiff returned to Dr. Kunkel on July 8, 2003, to discuss the results of the recent tests. Plaintiff's extremities were noted to be weak. Dr. Kunkel continued to assess Plaintiff with rheumatoid arthritis and a rheumatology consultation was ordered. (Tr. 101.)

Plaintiff returned to Dr. Kunkel on August 18, 2003. It was noted that Plaintiff continued to take Bextra. Plaintiff reported that she had been "horsing around" with her children and injured her left hand. Physical examination showed Plaintiff's left hand to be very tender. Plaintiff was diagnosed with tendinitis and additional medication was prescribed. (Tr. 100.)

Plaintiff visited Rheumatologist Dr. James Speiser on August 20, 2003. (Tr. 121-24.) Plaintiff reported that she began experiencing stiffness and aching in October 2002 and that by January 2003 the condition had become much worse. Plaintiff reported that the main joints affected were the metacarpal phalanges (MCP's) and PIP's[3] and that she experienced intermittent swelling. Plaintiff also reported that she experienced occasional pain in her shoulders and feet. Plaintiff reported her sleep to be "ok" and that her energy level fluctuates. Plaintiff also reported

---

[3]PIP's are the middle joints of the fingers. Rheumatoid Arthritis of the Hand (2006)<http://www.assh.org/Content/NavigationMenu/PatientsPublic/HandConditions/ArthritisRheumatoidArthritis/Arthritis_Rheumatoi.htm>.

that her condition worsens with any hand activities. (Tr. 124.) Physical examination showed tenderness in the left MCP's. Plaintiff's right hand was noted to be okay. Dr. Speiser noted no definite synovitis in the joints. Plaintiff had full range of motion in all joints. Fist strength was noted to be 100 percent; grip strength was noted to be fifty percent. Dr. Speiser's initial impression was that Plaintiff possibly had rheumatoid arthritis, but he noted that there was no synovial swelling that day. Plaintiff was instructed to increase her dosage of Indocin[4] and to return in four to six weeks. (Tr. 123.)

On August 26, 2003, Dr. Speiser reviewed Plaintiff's laboratory results obtained under Dr. Kunkel's treatment and noted them to be within normal limits. Dr. Speiser opined that Plaintiff "still could have [rheumatoid arthritis]" and determined to recheck labs during Plaintiff's next visit. (Tr. 120.)

On September 24, 2003, Plaintiff visited Dr. Speiser and complained of pain in her hands and of deep pain in her shoulders. Plaintiff also reported that she experiences a little pain in her knees and metatarsal phalanges (MTP's). Plaintiff reported that Indocin provided little relief. Dr. Speiser noted there to be no swelling of the joints. Plaintiff reported her sleep to be poor

---

[4]Indocin is an NSAID found to be effective in active stages of moderate to severe rheumatoid arthritis including acute flares of chronic disease, moderate to severe ankylosing spondylitis, moderate to severe osteoarthritis, acute painful shoulder, and acute gouty arthritis. Physicians' Desk Reference 1946 (55th ed. 2001).

and that her fatigue was at a level 4+. Examination of the extremities showed 2+ tenderness in the MCP's and PIP's, as well as in the trapezius, upper anterior chest, shoulders, low back, and knees. Dr. Speiser opined that a diagnosis of fibromyalgia seemed more likely than rheumatoid arthritis. Dr. Speiser determined to try Amitriptyline[5] for Plaintiff's condition. (Tr. 120.)

Results of laboratory tests taken September 24, 2003, continued to be within normal limits. Dr. Speiser noted there to be no evidence of rheumatoid arthritis or lupus and continued in his diagnosis of fibromyalgia. (Tr. 125.)

Plaintiff returned to Dr. Kunkel on October 14, 2003, for follow up on her referral visits. Plaintiff's current medications were noted to include Indocin, which Plaintiff reported provided no relief. Plaintiff complained of continued, unrelenting pain. Physical examination showed Plaintiff to have very weak hand grip. Dr. Kunkel diagnosed Plaintiff with fibromyalgia and chronic pain. Duragesic Patches[6] were prescribed. (Tr. 99.)

Results of additional laboratory testing performed

---

[5]Amitriptyline (Elavil) is indicated for the relief of symptoms of depression, Physicians' Desk Reference 626 (55th ed. 2001), but is also sometimes used to treat chronic pain or certain skin disorders, Medline Plus (last revised Apr. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html>.

[6]The Duragesic Patch provides a continuous, systematic delivery of fentanyl, which is indicated in the management of chronic pain in patients who require continuous opioid analgesia for pain that cannot be maintained by lesser means. Physicians' Desk Reference 1573-75 (55th ed. 2001).

November 26, 2003, were within normal limits.  (Tr. 128-29.)

On December 8, 2003, Plaintiff visited Rheumatologist Dr. Richard Di Valerio and complained of experiencing pain and stiffness all over but reported the condition to be worse in her arms.  Plaintiff reported that Darvocet[7] and Lodine[8] were not too effective.  Plaintiff also reported that Elavil made her feel groggy and hung over.  Physical examination showed no change.  Dr. Di Valerio noted Plaintiff's lab results to be normal.  Plaintiff was diagnosed with fibromyalgia and was instructed to discontinue Darvocet, Lodine and Elavil.  Ultracet[9] and Trazodone[10] were prescribed.  (Tr. 144.)  A bone scan of the total body performed that same date showed areas of mildly increased accumulation in the wrists in the third MCP joint of the left hand.  Nonspecific mildly increased accumulation in the right acromioclavicular joint was also noted.  (Tr. 161.)

---

[7]Darvocet is indicated for the relief of mild to moderate pain.  Physicians' Desk Reference 1708-09 (55th ed. 2001).

[8]Lodine is indicated for acute and long-term use in the management of signs and symptoms of osteoarthritis and rheumatoid arthritis, and for the management of pain.  Physicians' Desk Reference 3392 (55th ed. 2001).

[9]Ultracet is a combination medication containing narcotic analgesics and acetaminophen used to relieve pain.  Medline Plus (last revised May 6, 2002)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/500321.html>.

[10]Trazodone is used to treat depression, but is also used to treat anxiety and abnormal, uncontrollable movements that may be experienced as side effects of other medications.  Medline Plus (last revised Apr. 1, 2005)http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html>.

On December 18, 2003, Dr. Catherine M. Van Voorn completed a Physical Residual Functional Capacity Assessment for Disability Determinations based upon her review of Plaintiff's medical records from Dr. Kunkel and Dr. Speiser. (Tr. 130-37.) In the Assessment, Dr. Van Voorn opined that Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; that Plaintiff could stand and/or walk, as well as sit for about six hours in an eight-hour workday; and that Plaintiff was unlimited in her ability to push and/or pull. (Tr. 131.) Dr. Van Voorn opined that Plaintiff's use of ladders should only be occasional. (Tr. 132.) Finally, Dr. Van Voorn opined that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 133-34.)

Plaintiff returned to Dr. Di Valerio on February 2, 2004, who noted Plaintiff's symptoms to be the same as before. Plaintiff reported that her muscles feel "twitchy" and that she experiences a lot of twitching at night. Plaintiff reported that she obtains minimal help from Trazadone and that she feels fatigued the next day. Plaintiff complained of pain in the left hand and of deep pain in the right shoulder. Plaintiff also reported that her legs and feet hurt and that she obtains minimal help from Ultracet. Dr. Di Valerio noted there to be a slight decrease in grip strength of the left hand. No swelling of the hands or wrists was noted. (Tr. 145.) Dr. Di Valerio diagnosed Plaintiff with fibromyalgia.

Plaintiff was instructed to discontinue Trazadone, and Ambien[11] was prescribed. It was noted that arrangements were to be made for physical therapy. (Tr. 146.)

Plaintiff returned to Dr. Di Valerio on March 24, 2004, and reported that Restoril[12] was helping with sleep, although she continued to have periodic awakening during the night. Plaintiff complained that her daytime fatigue continued to be severe. Plaintiff also reported that she had a lot of pain and stiffness in her neck, shoulders, hips, and upper back, as well as anterior chest wall pain. (Tr. 146.) Physical examination showed tenderness about the upper back and anterior chest wall. Plaintiff was prescribed Restoril and Ultracet and was instructed to participate in physical therapy. (Tr. 147.)

On May 20, 2004, Plaintiff complained to Dr. Di Valerio that her legs fatigue easily with minimal activity and that she experiences a burning sensation when she goes up and down stairs. Plaintiff reported that she has no exercise tolerance. Plaintiff reported that Restoril helps a little with her sleep but that she only takes it when she is alone inasmuch as she needs to be alert for her children. Plaintiff reported that she takes Ultracet

---

[11]Ambien is indicated for the short-term treatment of insomnia. Physicians' Desk Reference 2974 (55th ed. 2001).

[12]Restoril is used on a short-term basis to help you fall asleep and stay asleep through the night. Medline Plus (last revised Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684003.html>.

during the day which helps "take[] the edge off." Plaintiff's leg strength was measured to be 5/5 at the hips and knees, bilaterally, with flexion and extension. Dr. Di Valerio noted Plaintiff to have normal transition from sitting to standing. Deep tendon reflexes were measured to be 2/4 bilaterally. (Tr. 148.) The result of lab tests performed that same date were within normal limits. (Tr. 159-60.) Plaintiff was diagnosed with myalgia and Voltaren[13] was prescribed. (Tr. 148.)

On June 17, 2004, Plaintiff reported to Dr. Di Valerio that she was sleeping a little better with Restoril but that she was not any better with Voltaren. Plaintiff reported that she was not doing well with her memory. Plaintiff complained of diffuse arthralgia and myalgia. Plaintiff reported her legs to be severely affected, especially with exercise and activity. Dr. Di Valerio noted Plaintiff to have irritable bowel syndrome and that Plaintiff's migraine headaches are "bad." Examination showed no swelling of the hands or wrists. (Tr. 149.) The results of lab tests performed that same date were within normal limits. (Tr. 158.) Dr. Di Valerio continued in his diagnosis of fibromyalgia syndrome. (Tr. 150.)

Plaintiff returned to Dr. Di Valerio for follow up on September 15, 2004. It was noted that Plaintiff's medications

---

[13]Voltaren is used for the acute and chronic treatment of the signs and symptoms of rheumatoid arthritis, osteoarthritis, and ankylosing spondylitis. Physicians' Desk Reference 2151-53 (55th ed. 2001).

included Restoril, Utracet and Vicodin.[14]   (Tr. 151.)  Plaintiff reported that her symptoms, overall, had worsened.   Plaintiff complained of pain and numbness in her right leg and that such symptoms were constant.  Dr. Di Valerio noted Plaintiff to complain of "lots of pain" and that she had not slept in "weeks."  Plaintiff reported that her energy during the day had decreased and that daytime fatigue had increased.   Plaintiff also reported that Restoril and the muscle relaxants provided no help, and that her headaches had returned.   Examination showed no swelling of the hands or wrists.   Dr. Di Valerio continued in his diagnosis of fibromyalgia syndrome and instructed Plaintiff to discontinue Restoril.  Halcion[15] and Effexor[16] were prescribed.  (Tr. 151.)

On November 17, 2004, Plaintiff reported to Dr. Di Valerio that her symptoms had been "bad" for the last few weeks. Plaintiff reported that the pain and achiness were "worse than ever."  Plaintiff reported that Halcion worked great but that she could not sleep without it.  Plaintiff also reported that Ultracet provided partial pain relief and that Vicodin helped a little. Plaintiff reported that she feels no different with Effexor.  (Tr.

---

[14]Vicodin is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference 1629-30 (55th ed. 2001).

[15]Halcion is indicated for the short-term treatment of insomnia.  Physicians' Desk Reference 2621-22 (55th ed. 2001).

[16]Effexor is indicated for the treatment of depression and anxiety disorders.  Physicians' Desk Reference 3361 (55th ed. 2001); Medline Plus (last revised Oct. 1, 2006)<http://www.nlm.nih. gov/medlineplus/druginfo/medmaster/a694020.html>.

152.) The result of lab tests performed that same date were within normal limits. (Tr. 155-57.) Dr. Di Valerio continued in his diagnosis of Plaintiff and instructed Plaintiff to increase her dosage of Effexor and to remain on the other medications as prescribed. In addition, Dr. Di Valerio prescribed Oxycodone[17] for thirty days. (Tr. 152.)

Plaintiff returned to Dr. Di Valerio on January 12, 2005, and reported no difference. Plaintiff continued to complain of musculoskeletal pain and reported that she had good days and bad days. Plaintiff complained of severe fatigue and that her arms feel tired just from driving. Dr. Di Valerio noted Plaintiff to be taking Oxycodone for pain relief which Plaintiff reported she does not take during the day. Plaintiff reported that she sleeps okay with Halcion. Dr. Di Valerio diagnosed Plaintiff with fibromyalgia syndrome and insomnia and prescribed Oxycodone, Halcion and Wellbutrin[18] for Plaintiff. Plaintiff was instructed to discontinue Effexor. (Tr. 153.)

On March 18, 2005, Plaintiff reported to Dr. Di Valerio that her energy level had decreased and her fatigue had increased. Plaintiff reported that she was sleeping pretty well but had more bad days than good days. Plaintiff also reported that her

---

[17]Oxycodone (Percodan) is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1211-12 (55th ed. 2001).

[18]Wellbutrin is indicated for the treatment of depression. Physicians' Desk Reference 1485-86 (55th ed. 2001).

headaches persist, and that she had more bad days than good days with those as well. Dr. Di Valerio diagnosed Plaintiff with fibromyalgia syndrome and insomnia and prescribed Oxycodone, Halcion and Prozac.[19] (Tr. 154.)

In a Physician Statement dated April 27, 2005, Dr. Di Valerio opined that Plaintiff could engage in no repetitive lifting, could frequently lift less than ten pounds and occasionally lift less than ten pounds. Dr. Di Valerio also opined that Plaintiff could stand and/or walk less than two hours in an eight-hour workday, and sit less than six hours in an eight-hour workday, with a need to alternate between sitting and standing to relieve pain or discomfort. Finally, Dr. Di Valerio opined that Plaintiff's ability to push and/or pull was limited by her upper and lower extremities. (Tr. 140.) In a separate letter dated April 28, 2005, Dr. Di Valerio wrote:

> To Whom It May Concern:
>
> . . .
>
> Sandra Darnell is a patient of ours at St. Louis Medical Clinic. She has a history of fibromyalgia syndrome which is characterized as fairly severe. Her clinical condition is characterized by significant arthralgias, myalgias, and fatigue. Her response to treatment has been limited, as if [sic] often the case for this particular diagnosis.

---

[19]Prozac is indicated for the treatment of, inter alia, depression and sleep disorders. Medline Plus (last revised Apr. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a6890 06.html>.

> Because of musculoskeletal pain and weakness,
> I believe that it would be difficult for her
> to perform any type of job involving physical
> activity or repetitive-type physical movement.
> I feel that there is a component of severe
> fatigue associated with this lady's
> fibromyalgia. As such, I do not see that she
> would be able to work a full-time, 8-hour day,
> 40-hour week job.

(Tr. 139.)

## IV.  The ALJ's Decision

The ALJ found that Plaintiff met the non-disability requirements for a period of disability and disability benefits under the Social Security Act through December 31, 2008. The ALJ also found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. The ALJ found Plaintiff to have a medically determinable severe impairment, but that such impairment did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ also found Plaintiff's allegations regarding her limitations not to be credible. The ALJ found Plaintiff to have the residual functional capacity RFC to perform a wide range of sedentary exertional work. The ALJ found Plaintiff unable to perform her past relevant work. Considering Plaintiff's age, education, work history, and ability to perform sedentary work, the ALJ determined that Medical-Vocational Rule 201.28, Table No. 1, Appendix 1, Subpart P of Regulation No. 4 directed a finding of "not disabled." The ALJ therefore determined Plaintiff not to be under a disability at any

time through the date of the decision.  (Tr. 21-22.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, Plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides

whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068(8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically,

that the ALJ erred by failing to give appropriate weight to the opinions of Plaintiff's treating physicians. Plaintiff also claims that the ALJ improperly substituted her own opinion for that of Plaintiff's physicians. Finally, Plaintiff claims that the ALJ erred in finding Plaintiff not to be credible.

A.   Medical Opinions

       Plaintiff argues that the ALJ erred in according little or no weight to the opinions of Plaintiff's treating rheumatologists, Drs. Di Valerio and Speiser, and by substituting her own medical opinions in their stead.   For the following reasons, Plaintiff's argument is well taken.

       A review of the ALJ's decision in this cause appears to show the ALJ to have discounted the diagnoses and opinions of Drs. Speiser and Di Valerio in their entirety.   Upon her own review of textual materials regarding fibromyalgia, the ALJ found the rheumatologists' diagnoses "suspect" and that there was "no basis for a diagnosis of fibromyalgia in the claimant's medical records." (Tr. 19.)   The ALJ also found that "contradictory medical records regarding Plaintiff's symptomalogies [sic] . . . cast further doubt on Dr. Speiser's and Dr. DiValerio's [sic] diagnosis of fibromyalgia." (Id.)   The ALJ erred in this evaluation.

       The Regulations require the Commissioner to give more weight to the opinions of treating physicians than other sources. 20 C.F.R. § 404.1527(d)(2).   A treating physician's assessment of

- 23 -

the nature and severity of a claimant's impairments should be given
controlling weight if the opinion is well supported by medically
acceptable clinical and laboratory diagnostic techniques and is not
inconsistent with other substantial evidence in the record.  <u>Id.</u>;
<u>see also</u> <u>Forehand v. Barnhart</u>, 364 F.3d 984, 986 (8th Cir. 2004).
This is so because a treating physician has the best opportunity to
observe and evaluate a claimant's condition,

> since these sources are likely to be the
> medical professionals most able to provide a
> detailed, longitudinal picture of [a
> claimant's] medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations.

20 C.F.R. § 404.1527(d)(2).

As such, evidence received from a treating physician is generally
accorded great weight with deference given to such evidence over
that from consulting or non-examining physicians.  <u>See</u> <u>Thompson v.</u>
<u>Sullivan</u>, 957 F.2d 611, 614 (8th Cir. 1992); <u>Henderson v. Sullivan</u>,
930 F.2d 19, 21 (8th Cir. 1991).

Opinions of treating physicians do not *automatically*
control in determining disability, however, inasmuch as the
Commissioner is required to evaluate the record as a whole.
<u>Charles v. Barnhart</u>, 375 F.3d 777, 783 (8th Cir. 2004).  When a
treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. § 404.1527(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. <u>Id.</u> The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." <u>Id.</u>

In her written decision, the ALJ here discredited the opinions of Drs. Speiser and Di Valerio finding their diagnoses of fibromyalgia not to be consistent with textual materials, cited by the ALJ, as to what constitutes an appropriate diagnosis. The ALJ also found that the doctors' lack of notations regarding the methodology as to how they reached their diagnoses, or of how Dr. Di Valerio concluded that Plaintiff's condition was fairly severe, further discredited their medical diagnoses. Finally, the ALJ found "contradictory medical records" to cast further doubt on Dr. Speiser's and Dr. Di Valerio's diagnoses of fibromyalgia. (Tr. 19.) These reasons for discrediting the opinions of Plaintiff's treating physicians are not supported by substantial evidence on the record as a whole.

First, in determining there to be no basis for the medical diagnosis of fibromyalgia as rendered by Plaintiff's treating rheumatologists, the ALJ substituted her own medical opinion, stating:

> Fibromyalgia is a diagnosis of exclusion and is based upon a history of widespread pain and pain in eleven of eighteen specific trigger points on digital palpitation (Official Diagnostic Criteria Developed for Fibromyalgia by the American College of Rheumatology (ACR) in 1990). Thus, it is a subjective diagnosis based upon 1) the claimant's protestations of pain when palpitated, i.e., when poked and prodded, the claimant reports that she hurts, and 2) a diagnosis of exclusion (see Tierney, McPhee, and Papadakis, Current Medical Diagnosis and Treatment (1996 ed.), pp. 733-734). In addition, numerous objective medical tests are required to reach such a diagnosis. Each objective medical test producing a negative/normal result eliminates an impairment that would have produced a positive test result, as a possible cause of the claimant's impairment. Therefore, a diagnosis [of] fibromyalgia requires an examination of eighteen "trigger points" and the elimination of possible impairments based on numerous negative/normal test results.
>
> I note that there is no basis for a diagnosis of fibromyalgia in the claimant's medical records. . . . There is no history of widespread pain and pain in eleven of eighteen specific trigger points on digital palpitation. The records indicate the existence of only two "trigger points" and negative laboratory tests [sic] results for rheumatoid arthritis and lupus. These findings do not support a diagnosis of fibromyalgia (also known as fibrositis)[.]

(Tr. 19.)

It is well settled that an ALJ is not free to interpret the medical records by substituting her own judgment for the recorded impressions of a claimant's treating physicians. Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990). By substituting her observation for the medical judgment of Plaintiff's physicians that Plaintiff suffered from fibromyalgia, the ALJ here "ignored the law of this circuit, which states that the ALJ must not substitute his opinions for those of a physician." Id.; see also, e.g., Delrosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991) (ALJ committed "egregious error" by rejecting express diagnosis given by a treating physician). With repeated diagnostic testing and physical examinations, Plaintiff's treating physicians – rheumatology specialists – consistently diagnosed Plaintiff with fibromyalgia and prescribed progressively stronger pain medications for the condition. Instead of crediting the opinions of these rheumatology experts, the ALJ substituted her own unsubstantiated conclusion regarding Plaintiff's impairment for the express diagnosis of these treating physicians. "Such disregard of the record constitutes reversible error." Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir. 1992) (citing Delrosa, 922 F.2d at 484-85).

The ALJ also criticized the failure of the doctors to make notations regarding how they concluded that Plaintiff had fibromyalgia or how Dr. Di Valerio determined Plaintiff's condition to be fairly severe, and that their medical records were

contradictory. Contrary to this finding, the record is replete with medical observations consistently describing Plaintiff's symptomatology of fibromyalgia. Beginning in January 2003, Plaintiff's primary physician, Dr. Kunkel, began treating Plaintiff for her complaints of stiffness, weakness and pain in her hands, which symptoms quickly progressed to her elbows and shoulders. X-rays and laboratory testing in response to such complaints were ordered to determine whether Plaintiff suffered from rheumatoid arthritis or osteoarthritis. Plaintiff experienced tenderness to touch and was prescribed various medications. From January to August 2003, Plaintiff consulted with Dr. Kunkel on no less than six occasions regarding her progressive symptoms and underwent diagnostic testing on at least five occasions during that period, including blood tests, x-rays and echocardiograms, all of which were normal and/or negative. Beginning in August 2003, Plaintiff saw Rheumatologist Dr. Speiser upon referral from Dr. Kunkel. Plaintiff continued to complain of pain, stiffness and discomfort; and also complained of fatigue, exacerbation of symptoms with activity, and of poor sleep. Physical examination on September 24, 2003, showed Plaintiff to experience tenderness in the MCP's, PIP's, trapezius, upper anterior chest, shoulders, low back, and knees. Upon review of the negative/normal test results and upon physical examination, Dr. Speiser determined to diagnose Plaintiff with fibromyalgia. Subsequent laboratory testing continued to be

normal/negative, and Dr. Speiser continued in his diagnosis of fibromyalgia. In the sixteen-month period between December 2003 and March 2005, Plaintiff visited Rheumatologist Dr. Di Valerio on no less than nine occasions. During this period, Dr. Di Valerio's notations indicate that Plaintiff suffered from chronic pain throughout her body, including her hands, arms, shoulders, back, legs, and feet; daytime fatigue; poor sleep; activity intolerance; poor memory; headaches; and irritable bowel syndrome. Laboratory tests performed during this period continued to show negative/normal results. Throughout this period, Dr. Di Valerio's diagnosis of fibromyalgia remained the same and various medications were prescribed, notably increasing in both strength and dosage, but with limited success. In April 2005, Dr. Di Valerio opined that Plaintiff's condition was "fairly severe" and that Plaintiff would be unable to engage in full time work on account thereof.

As set out above, Plaintiff "long exhibited symptoms consistent with fibromyalgia, such as sleep deprivation, fatigue, and pain." Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004) (citing Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)). Plaintiff experienced such symptoms, which were progressively worsening, and underwent diagnostic testing for a period of months prior to receiving the diagnosis of fibromyalgia from a rheumatologist, Dr. Speiser. For sixteen months thereafter, Rheumatologist Dr. Di Valerio continued to diagnosis Plaintiff with

fibromyalgia, and such diagnosis was consistent with the findings and diagnosis of Dr. Speiser. While the ALJ is critical of the lack of notations regarding their continued diagnoses of fibromyalgia, the undersigned notes the record to be replete with the physicians' own medical observations of Plaintiff's consistent symptomatology of the disease, as well as notes of their physical examinations showing multiple-point tenderness throughout Plaintiff's body and repeated negative/ normal diagnostic testing. Indeed, as recently noted by the Eighth Circuit in <u>Forehand</u>, "[t]he disease is chronic, and '[d]iagnosis is usually made after eliminating other conditions, as *there are no confirming diagnostic tests*.'" <u>Id.</u> (emphasis added) (quoting <u>Brosnahan v. Barnhart</u>, 336 F.3d 671, 672 n.1 (8th Cir. 2003)).

The Eighth Circuit has recognized that fibromyalgia can be disabling because of its potential for sleep derangement and resulting daytime fatigue and pain; and that complaints consistent with a diagnosis of fibromyalgia include variable and unpredictable pain, stiffness, fatigue, and ability to function. <u>Brosnahan v. Barnhart</u>, 336 F.3d 671, 678 (8th Cir. 2003); <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998); <u>see also</u> <u>Daniel v. Massanari</u>, 167 F. Supp. 2d 1090, 1091 (D. Neb. 2001) (people with fibromyalgia may also experience irritable bowel syndrome). A review of the record here shows Drs. Speiser's and Di Valerio's medical observations and physical examinations of Plaintiff to be

consistent with each other's findings and consistent with the medical diagnosis of fibromyalgia. Indeed, nothing in the record other than the ALJ's own opinion runs counter to their findings. In discounting these opinions without good reasons and substituting her own medical opinion for the express diagnosis of a treating specialist, the ALJ committed error. <u>Delrosa</u>, 922 F.2d at 485. If the ALJ questioned the existence of Plaintiff's diagnosed condition, she was required, at a minimum, to order a consultative examination. Substituting her own opinion instead was impermissible. <u>Id.</u>

B. <u>Credibility Determination</u>

Plaintiff claims that the ALJ erred in finding her subjective complaints of pain not to be credible.

In determining a claimant's subjective complaints of pain, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to: 1) the claimant's daily activities; 2) the duration, frequency and intensity of the claimant's pain; 3) precipitating and aggravating factors; 4) the dosage, effectiveness and side effects of medication; and 5) claimant's functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, she may disbelieve a claimant's complaints if

there are inconsistencies in the evidence as a whole. <u>Id.</u>

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the <u>Polaski</u> standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in her decision that she considered all of the evidence. <u>Id.</u> at 738; <u>see also</u> <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the <u>Polaski</u> factors but then discredits a claimant's complaints for good reason, the decision should be upheld. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005); <u>Pearsall</u>, 274 F.3d at 1218.

In this cause, the ALJ did not specifically invoke <u>Polaski</u> by name but nevertheless identified the factors required by <u>Polaski</u> to be considered when assessing Plaintiff's credibility, that is, Plaintiff's prior work record; daily activities; the duration, frequency and intensity of Plaintiff's pain; any

precipitating and aggravating factors; the dosage, effectiveness and side effects of Plaintiff's medication; treatment other than medication for relief of symptoms; and any functional restrictions. (Tr. 17.) A review of the ALJ's determination shows, however, that the ALJ addressed and evaluated only the objective medical evidence of record (which, as discussed <u>supra</u>, the ALJ erroneously discredited), and Plaintiff's daily activities. The ALJ's credibility determination is wholly devoid of any meaningful discussion of the remaining <u>Polaski</u> factors, and specifically, the duration, frequency and intensity of Plaintiff's pain; precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and Plaintiff's functional restrictions, despite substantial evidence on the record relating thereto. The ALJ's mere conclusory statement that the Plaintiff's subjective complaints regarding her functional limitations and the effect of her pain are inconsistent, with nothing more, is insufficient to satisfy the mandate of <u>Polaski</u>. <u>Cline</u>, 939 F.2d at 565, 569; <u>see also</u> <u>Harris v. Shalala</u>, 45 F.3d 1190, 1193 (8th Cir. 1995) (ALJ must do more than merely invoke <u>Polaski</u> to insure "safe passage for his or her decision through the course of appellate review.").

In addition, contrary to the ALJ's specific finding, it cannot be said that Plaintiff's daily activities are inconsistent with her subjective complaints of pain. The ALJ found Plaintiff

not to be so limited as her complaints would suggest given her daily activities of grocery shopping, cooking prepared foods, driving short distances, using the computer, attending church, helping her children prepare for school, and doing some laundry. (Tr. 19.) The ALJ fails to note, however, that Plaintiff limits her grocery shopping to one half-an-hour trip every week or two and requires assistance to do so; that pain, grip strength and side-effects of medication limit Plaintiff in her driving; that Plaintiff's use of the computer consists of reading e-mails for five or ten minutes a day; that Plaintiff often misses church because she does not feel well; and that while she may occasionally try to do a load of laundry, her family performs the remaining housework almost exclusively. As repeatedly emphasized by the Eighth Circuit, a claimant's ability to engage in limited activities, such as grocery shopping, attending church and light housework, is not inconsistent with complaints of pain and provides little or no support for a finding that the claimant can perform full-time competitive work. See Draper v. Barnhart, 425 F.3d 1127, 1131 (8th Cir. 2005), and cases cited and discussed therein.

In light of the above, it cannot be said that the ALJ demonstrated in her written decision that she considered all of the evidence relevant to Plaintiff's complaints or that the evidence she considered so contradicted Plaintiff's subjective complaints that Plaintiff's testimony could be discounted as not credible.

<u>Masterson</u>, 363 F.3d at 738-39.   Accordingly, because the ALJ's decision fails to demonstrate that the ALJ considered all of the evidence under the standards set out in <u>Polaski</u>, this cause should be remanded to the Commissioner for an appropriate analysis of Plaintiff's credibility in the manner required by and for the reasons discussed in <u>Polaski</u>.

## VI.  Conclusion

For all of the foregoing reasons, the Commissioner's decision that Plaintiff was not under a disability at any time through the date of the final decision is not supported by substantial evidence on the record as a whole.   Upon remand, the Commissioner should accord appropriate and deferential weight to the opinions of Plaintiff's treating physicians, including Dr. Di Valerio's opinion as to specific limitations placed upon Plaintiff as a result of her medically diagnosed condition.   In the event controlling weight is not accorded to such opinions, the Commissioner must give good, legally sufficient reasons for the weight given with such reasons to be supported by substantial evidence on the record as a whole.   In addition, any credibility determination regarding Plaintiff's subjective complaints should be accompanied by a specific and meaningful discussion of the factors set out in <u>Polaski</u> demonstrating that all evidence of record has been considered in such determination.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this cause be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **January 2, 2007.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this <u>20th</u> day of December, 2006.